May it please the Court, my name is Malcolm Siegel, counsel for Appellant. I'd like to reserve two minutes for rebuttal if it becomes necessary. Your Honor, as in many cases where Brady v. Maryland intersects Rovario v. United States, the law is fairly clear and this case is driven by the facts. I'll mention some of them, although I know you've read the briefs, because I In 2014, FBI agents in the Intelligence Division at the American Embassy in Romania were using a Romanian citizen as an intelligence-gathering informant to report on Romanian citizens. Those citizens were involved in business and in politics. As it applies to this case, the informant was providing information about a family that he was very close to, the Martin family. Members of that family had held a public office in Romania. They'd been elected to positions and appointed to positions, and the appellant himself had also held political office in Romania, even though he was living in the United States and had been living here for some time. The Romanian informant told the that George Martin, the brother who managed the family business called Polaris in Romania, wanted to bribe somebody at the American base in Romania in order to obtain a contract. The informant said that he had talked directly to George Martin. But what is it you think that the government withheld? What they withheld, Your Honor, was approximately 20-plus reports of debriefings of the informant in which he laid out allegations against political figures and business figures throughout Romania, including the appellant and his family. These are the materials that were supplied to you on August 16, 2016? Those were the materials that were supplied just a few days before trial in a format which was not at all useful to the appellant. What format would have been useful? They were they were they were blacked out or redacted almost in their entirety. They said they could make arrangements for you to get the unredacted. The – I personally went and looked at the – after I was retained at those documents at the United States Attorney's Office, and counsel for the government had laid out reports around the room. I was there with two associates. Those reports were still partially redacted to eliminate case numbers and the number of the informant. And worse yet, the Assistant United States Attorney would not let us copy those documents or even make notes about those documents. Okay. You've seen the unredacted documents now? No. I've seen partially unredacted documents, Your Honor. Okay. So what – so what is – what is exculpatory in these documents? If one looks at the documents – It wasn't a very – it wasn't very many documents. It wasn't – it wasn't a long – it wasn't a big packet of stuff. The documents had an enormous amount of content to them. They were difficult to read. And each of them contained allegations that could have been verified with ample time to – or contradicted with ample time to research the documents. That is to say, they made allegations about a number of cases and individuals that were involved in Romania in business activities. What would have exonerated your client? It's not the case of exonerating, Your Honor. What they would have done would have been is to show entrapping conduct by the informant. The informant had geared his – all his activities towards trying to entrap the Martin family in various criminal activities. And so what was in these documents that would have helped the entrapment defense? The documents would have shown his dedicated effort, presumably for compensation over the period of two years, to try to make a case against the Martin family. Yeah, but that doesn't show entrapment by itself. I mean, what part of it's going to show entrapment? Then the next stage was, even though the informant was supposed to be an intelligence-gathering informant, he traveled at the behest of the FBI to the United States, although the agent was reluctant to permit him to travel because he was not available to testify. And he met with my client, Dimitri Martin, here in the United States. And the purpose of his meeting with him was the same purpose of meeting with other Polaris employees, and that was to provide comfort to him that the deal was real and that it was going to be valuable to him. Okay. Which document would demonstrate that? The documents would show – Which document? Can you give me a page? I would have to pick out the pages, Your Honor. I can supply them to the Court following the hearing. Well, if you go to what the district court said, maybe you could address that, and that is the documents were offered up. You were also offered a chance to look at them again. And you had, by then, I realize it wasn't months before, but you had at least almost a week to do something, right? I think it was five days. Five days, maybe after the 7-1, get down to five days. So district court basically said that, in its view, there was adequate time. And also that virtually everything in there was inculpatory, that it wasn't anything exculpatory. So we're kind of – we're kind of stuck. We're doing a rock-and-a-hard place in terms of a concrete argument for your client. I get it, Your Honor. The problem is this. The documents, if unredacted, would have had materials in them. There are allegations about contacts, about activities, which could have been investigated in Romania where this began. It was impossible by the time the defense received those documents to subpoena witnesses from Romania. They couldn't subpoena the FBI agent who was back in Romania because they couldn't satisfy the requirements for a subpoena. They couldn't satisfy the informant because the informant was not identified. The point of this is, is that there's no excuse for the government to have supplied those documents late. Well, I mean, there's a question as to whether they had to supply them at all. Well, the difficulty I have with that concept, Your Honor, is, is that if they didn't have to supply them at all, why did they supply them the day after the district court warned them that they may have to — Well, sometimes they'll do it out of an abundance of caution. They may dump stuff. I mean, you could be lucky that they didn't dump hundreds of pages of other things that were absolutely irrelevant out of an abundance of caution so they don't get accused of Brady violations. And that's why I asked you, counsel, because I've looked at the documents. That's why I asked you, you know, which one in particular is there — give me your best shot. What's the best document you've got here for showing — for showing what you could have done with this? My best shot is that those documents, taken as a whole and read in the clear, which I was not able to do, would show that there were at least 40 allegations that — 30 to 40 allegations about specific conduct in Romania, which the defense could have used to challenge the credibility of the informant. And if I say nothing else, I think it's important to recognize the informant played only one role in this case, and it's the role that Rovario v. the United States supplies. And that is, the informant came to the United States to meet with Polaris employees and to meet with Appellant, who he knew was going to be in California for the meeting. Counsel, I'm a little confused. The — the confidential source didn't testify at trial, right? He was not permitted to testify at trial. Right. So how could you — how could the documents have gone to his credibility? Because — because had the defense known that he had made those allegations, they would have tried to subpoena him to testify. But may I complete the other thought, Your Honor, which is this. Rovario says that someone who is present at the commission of the crime, serving as an informant, to provide comfort or sustenance to the participants — not because he's doing the deal himself, but to provide comfort — requires that his identity be disclosed in a timely way. And here, under Brady, a timely disclosure would have been required months before. The agents knew four months before these documents were disclosed that the case was going to trial. The government attorneys knew the case was going to trial. The defendant had opposed a prior continuance. Nonetheless, the district court continued the case for four months. They had ample time to produce those documents. The — the weak explanation they used makes no sense. The agent prepared those documents, typed them, over a two-year period of time. He had them in his files. Before you run out of time, I do want to ask you about the sentencing issue. And I understand the textual argument for actual authority versus either apparent or perceived. But I would appreciate your comments on how you square your position with the commentary, which then talks about an individual involved in an offense acting in an undercover capacity. And that seems to me that it would suggest that a belief would be sufficient if you're looking at what the perceived status of the individual is. I think the cases speak otherwise, Your Honor. And I think that the — the purpose of the guidelines is to add additional punishment for a — a conduct which deals with a real public official who is dealing in a sensitive position. The U.S. attorney could have dressed up a police officer to pretend to be a colonel. They — they could have used anyone to be a colonel. They chose someone who didn't have authority to do anything by way of contracting with — with a third party. I can't imagine that the guidelines intended to add another 35 months because the defendant interacted with a pretend person. That's not what the intent of the guidelines is. It's to add enhancements for specific activities involving public officials. Otherwise, it makes no sense. I'll reserve my additional time. Thank you very much, Your Honor. You're out of time, but I'll give you a minute for rebuttal. I appreciate it, Your Honor. Your Honors, Michael Beckwith on behalf of the United States. I was one of two trial counsel in this case. May it please the Court, I'd like to start with an issue raised by Judges Fletcher and Bybee. Your Honors, there was no exculpatory information in the August 26th documents. The information contained therein, if anything, was inculpatory and was provided to the defense in advance of trial out of an abundance of caution. Now, you — the letter doesn't even — doesn't even mention Brady. It mentions the Jenks Act. Yes, Your Honor. So what's the motivation for providing it under the Jenks Act? Your Honor, there may — I think it's, again, out of an abundance of caution. The witness at issue here was never called by the government to testify. He was a non-testifying witness. And because the government is calling a number of other witnesses that are going to talk about the issue generally, we provide that information out of an abundance of caution. We don't believe that it was subject to a statutory or other requirement in this case, but we do provide those out of an abundance of caution. And as the district court found when it reviewed those documents, there was nothing in them that was exculpatory or impeaching. With regard to — unless the Court has other questions about the Brady allegations, which this — which the government does take very seriously, I'll shift to the sentencing issue. Now, Mr. Siegel says, look, it — it may — there may not be anything that's — that's other — other people that we might — that we might have called. It might have changed our — it might have changed our — our defense. Yes, Your Honor. We disagree with — I guess with — with that assessment in that, one, there was no obligation for us to turn over these documents. And documents that were similar to, and in some cases more compelling than these documents, were provided to the defense months before trial. As the government noted in its brief, they had witness — they had Mr. Schiller's debrief report, which talked about the witness — or, excuse me, the — the informant. They had debrief reports from the Ligat CHS, which were much more detailed about his involvement with Gheorghe Martin and also his trip to the — the United States. While we were not obligated to provide those documents, we nonetheless produced them. And the defendant here has failed to show, in kind of this Brady-slash-Rivario context, that they were at all helpful. And because he failed to show that they were all helpful, the government had no obligation. All he had to do was proffer that Mr. Marin, at some point, engaged with the defendant in this case. And despite a request to do so, they failed before trial, during trial, and after trial to present any proffer that Mr. Marin entrapped or induced the defendant, in this case, to commit the crime. Unless there are other questions about this, I'll move on to the sentencing. With regard to sentencing, Your Honor, the conduct in this case falls squarely within the guidelines and also this Court's interpretation of those guidelines. Specifically, we have a number of meetings in which the defendant in this case said that or exempt or stated that he wanted to target the major because of his power. It was the major's power that he was focused on, and the Court has had a chance to look at those and review those tapes. In this instance, the guidelines address Well, in every instance, the guidelines addressed different people differently. And here we have a defendant who wants to engage in a seven-figure bribe to obtain a $10-plus million contract. The severity of this crime is significant. The defendant's intent in this crime was clear, as made manifest in the recordings, and it was specifically the major that he focused on. Even when Rashan said, why don't we cut him out, Mr. Martin came back and said, no, no, if he has the power to do this, of course we would do this. And I think as Would your answer be the same if the major had actually sent in basically a flunky or his next-door neighbor to pose as the target? If the major had If we're talking about someone that would be equivalent to, I think as we mentioned in our brief, a DMV official, or if the focus was a lower-level bribe Well, the person came in and represented themselves acting on behalf of the major, for example. No, I think our position would be the same, because what's at issue here is a million-dollar bribe and a $10 million contract. And if that person had the ability to influence the major and influence the commander of that contracting squadron, then, yes, that would be a sensitive Well, doesn't it really depend on who's kind of whose ox's gourd here? In other words, do you look at the defendant's belief, or do you look at the target's authority? I think it would be both, Your Honor. In this case, I think it would be both. And the Guidelines recognize that. We look at the Guidelines, and they focus on differentiating sentences based on the conduct and the severity of the crime. And whether part of that equation is going to be the defendant's intent and what he or she is willing to do, that's going to speak to the severity of the crime. And obviously, the person that they're targeting also would speak to the severity of the crime. If it's a DMV employee, that's different than a congressman. If the person is engaged in an attempt to bribe and offer a bribe in exchange for a multimillion-dollar contract, that's more significant than trying to get a driver's license. And so I think it's both in this instance. And the Guidelines, the Guidelines and this Court's case law recognize that. Specifically, the Guidelines want to, in Chapter 1, the Guidelines want to sentence people fairly and appropriately, and they differentiate the sentences based on the at issue. And specifically, with regard to Guideline 2C.1.2, and as I think you pointed out, the commentary there is, we think, compelling, in that an attempt, even an attempt where they either they could not do it or they failed to do it, an attempt is treated as equivalent to the underlying offense. And so that's Guideline, that's the Guidelines' commentary in the background. I've got trouble getting past the actual wording, though. The wording of the Guideline in the text is, if the offense involved, if the offense involved an elected public official, any public official of high-level decision-making or sensitive position increased by four levels. It doesn't say anything about someone pretending to be or masquerading as. The commentary at the very end talks about people acting undercover, but that's with respect to the entire Guideline, and that can apply to other parts of the Guideline without any difficulty. Yes, sir. So I'm having trouble reading that last bit of the commentary as telling us that the words of B3 don't mean what they say. Well, I think when we read them together, I think they do, they are helpful. And that is that that. So you're reading B3 and you're reading offenses involving bribery frequently not completed because those are the two things you're reading together? The last paragraph of the commentary? B2 talking about the four-level enhancement. I'm sorry, B3, yes. B3, yeah, yeah. B3. And then in the commentary. The very last paragraph of the commentary. Yes, and so that's an inchoate crime. And so what we're talking about in the commentary is an attempt, something that wasn't committed. And that could be because either the official didn't actually have the power that he or she said she had, or that the the that it was a sting, and they couldn't commit it. Right. But my point is that this last paragraph is quite general, and it says, and quite, I understand it perfectly, and this wasn't after, it says, offenses involving attempted bribery frequently not completed because the offense is reported to authority as an individual acting in an undercover capacity. That means this guideline does apply. But it doesn't specifically say that it applies to B3 to mean that B3 should be interpreted to mean not only an actual official or someone pretending to be an official. So I have trouble seeing that this last paragraph, which is quite general, is intended to apply specifically to B3 rather than generally to the entire guideline, where it obviously does apply. How do you respond to that? I think that's fair. It is a general analysis, or it is a general commentary. But if we're looking at the heart of the crime, the heart of the conduct, what are we talking about here? What is the severity? What is it that makes this crime so serious? It's the defendant's intent and his targeting of a position or an official. Well, no, I get that. And I don't get to write the guideline. I get that. That's fair. But we – I think our position is that this general commentary does apply to the entire guideline. It does acknowledge inchoate crimes. It does acknowledge attempts. And I think the – what this commentary is getting at is the fact that the thing that makes the crime serious is – one of the things that makes the crime serious is the defendant's intent. And here, the defendant intended to offer a million-dollar bribe. Oh, no, I understand all that. Okay. I'm not going to go back then. Here, they did – he's negotiating with this guy O'Neill, actually, right? Yes, Your Honor. Who's not Mr. – who's not Williamson. But would it matter, then, in your view – the argument here is, well, O'Neill didn't have any contracting authority. It had been suspended. So at one point he did, but now he doesn't. But would it matter if it was just anybody, not O'Neill, but the defendant perceived the individual to have authority? I mean, literally, you could send in the grocery store takeout person, right? Sure. Under your scenario. Sure. So in this case, O'Neill and Williamson are the same person. Right. He is, in fact, official. He's a commander of the squadron, et cetera. Correct. I understand. Let's say – But he doesn't have any present authority. Is that correct, or is that disputed? Well, so – I mean, this is a – this is very much a technicality. Because he is technically the commander of the squadron, his contracting warrant is removed to avoid conflict of interest under the regulation governing contracting. But he still is the commander of that squadron and could influence other members of that squadron. He had – he actually had authority. It's Rochon, who was Chris, who had been – who had gotten in trouble and was assisting Williamson in the ruse, who was working off part of his sentence by helping him. Yes, Your Honor, that's correct. So – so Williamson, the major, is a real person, a real army officer. Yes, I understand, with – with real commanding authority. Yes, and was – was a commander at the time. And so there's – you know, it's one thing to build a contract to issue the contract. It's another thing to provide information. And so in either – even though he could not issue a contract because he was technically the commander, he still could provide information or influence others within the squadron to do so. So in his – in his scenario, in this case, we think it certainly applies. If we were to take the hypothetical that you're suggesting and talking about, let's say the commander said – grabbed an airman and said, go, you know, you go do this. You go pretend to be the commander. You go pretend to be the commander and do that, yes. We believe, because the guidelines and the Miller case, we believe that because the guidelines focus on the severity of the crime, in Chapter 1, one of the balancing factors that they're looking at is a proportional sentence. And what is – what – you know, and matching – that's a pretty high level of generality when we're dealing with the rule here. That's fair. So then, of course, we would take it right to the commentary for the – for the specific guideline. And they're still looking at the ability in an inquiry crime or a crime that's incompleted to sentence – to sentence in accordance with the severity of the crime. And here, even if it was an airman that was pretending to be the commander, we have found a defendant who's willing to travel across an ocean, who's willing to come across the country and offer a million-dollar bribe in exchange for a government contract in Romania. I think we have your argument in mind, unless you had another question. Martin was convicted of attempted – attempt to bribe. Is that correct? No, he was – well, he – no, he paid $100,000. He made the initial payment and promised to make another $900,000 payment over time using a – using a fake company. So they had two phony companies set up. He – Martin paid a – his company paid $100,000 initially with a promise to pay the remaining $900,000. So what was he convicted of? Conspiracy to engage in bribery and bribery itself. So bribery – it is bribery even though it's given to somebody who's not capable of being bribed on the actual underlying facts? Yes, Your Honor. Okay. And the courts have long held that 201 liability applies regardless of the official's ability to – to carry out. I think – I think this is clear from what we already said, but I think I want to – I want to make it crystal clear on my own mind. In your view of – we read the guideline, it doesn't matter for purposes applying the 23 – excuse me, the B3 guideline that it was someone who was in fact a high-level officer pretending to be a different high-level officer compared to an airman or a grocery store clerk pretending to be the high-level officer. In your view, the guideline applies in either case? Yes, it would apply in both cases, in both. So the mere accident, as it were, that the person doing the impersonating is a high-level officer, in your view, doesn't make any difference? I mean, if we take that to a logical conclusion, that would be correct. And I think we would hold on the position that the severity of the crime is in part, large part, determined by the defendant's intent. I get that part. Thank you. All right. Thank you very much for your time. I'd like to give you two minutes for rebuttal. If you please, Your Honor, I think I put the proverbial cart before the horse. The – this case really starts with Ravario v. United States. The government should have disclosed the informant because of his presence at the fact that he set up the crime in his initial conversations with George Martin. The court gave an entrapment instruction to this jury based in part, although small part, on the informant's conduct during the course of the case. It comes down to this. There's no single line in any of these informant reports which are exculpatory. But if the jury was aware, if the informant was subpoenaed, if the agent was subpoenaed, and the jury was made aware that Marin was a spy for not only the United States government, but also if you look at the unredacted documents for the secret police in Romania, if the jury knew that, and they knew the degree of his involvement in this investigation, that information would be exculpatory in the sense that it would demonstrate the basis for the entrapment defense. And ultimately, this is probably more like Carlsby-Whitley, and that is when you examine all the evidence before you, isn't the answer to the question that had the jury known this information, it would likely have considered that and might have achieved a different result. The basic question is due process and fairness. Should the government have provided that information? How could it, with a straight face, allow a trial to proceed where everybody was referring to this man as Marin, but wouldn't so much identify himself, identify Marin to the court as an informant, or even in its brief, admit that to this court? Or even admit that to this court under seal or a protective order, so the court might know whether Marin was an active spy for the FBI intelligence agents in Romania, and that's why he did what he did. Thank you. Submitted. Thank you very much. Thank both counsel for your argument this morning, or this afternoon. We're not used to sitting in the afternoon. The United States v. Martin is submitted, and the next case for argument will be Johnson v. McDowell.
judges: McKeown, W. Fletcher, Bybee